

**SO ORDERED.**
**SIGNED this 12th day of April, 2013**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

In re:

                                          No.   12-12364
                                          Chapter 7

DARRELL EUGENE HUGHES and
LORI LYNN HUGHES,

        Debtors;

RICHARD P. JAHN, JR., TRUSTEE,

        Plaintiff

v

                                          Adversary Proceeding
                                        No.   12-1086

DARRELL EUGENE HUGHES and
LORI LYNN HUGHES,

        Defendants.

*Appearances for the Trustee*

> Richard P. Jahn, Jr.
> 1200 Mountain Creek Road, Ste.160
> Chattanooga, Tennessee 37405

*Appearances for the Debtors*

> W. Thomas Bible, Jr.
> Harry Miller
> 6918 Shallowford Road, Suite 100
> Chattanooga, Tennessee 37421

## MEMORANDUM

In this adversary proceeding the Trustee, Richard P. Jahn, Jr. ("Plaintiff" or "Trustee") asks this court to deny the discharge of the debtors, Darrell Eugene Hughes and Lori Lynn Hughes ("Debtors"), pursuant to 11 U.S.C. § 727(a)(4)(A). The Debtors deny that they engaged in conduct prohibited by § 727(a)(4)(A) and assert that they are entitled to a discharge pursuant to Chapter 7 of the Bankruptcy Code. After a review of the testimony, exhibits and relevant case law, the court finds that the Debtors' discharges should be denied.

These are the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

### I.    Facts

The Debtors filed their Chapter 7 petition for bankruptcy on May 8, 2012. Trial Exhibit 1 Petition, Statement of Financial Affairs and Schedules. Mr. Hughes is not employed. He was disabled following a heart attack he suffered in 2007. Mrs. Hughes also has medical problems. She suffered a job loss shortly after her husband's heart attack, but she is now employed. The Hugheses also took in Mr. Hughes' ailing mother in 2010. She passed away in 2011 leaving the family with her funeral expenses. The Debtors have four children, one of whom still lives at home with his

2

parents. *See* Trial Testimony of Lori Lynn Hughes ("Mrs. Hughes' Testimony"), April 9, 2013 at

9:40-9:47 a.m., 10:15 a.m.; Trial Testmony of Darrell Eugene Hughes ("Mr. Hughes'

Testimony"), April 9, 2013, at 10:21-10:32 a.m.

   After suffering his heart attack, Mr. Hughes joined a class action products liability lawsuit,

filed in Colorado, against the manufacturer of Avandia, a drug used for treating diabetes ("Class

Action Lawsuit"). The plaintiffs in the Class Action Lawsuit contended that the drug caused heart

attacks in patients who took it. In March of 2012, Mr. Hughes received a partial settlement check

related to the Class Action Lawsuit in the amount of $43,806.89 ("Settlement Payment"). *See* Trial

Exhibit 8, Trial Exhibit 10, Partial Transcript of 341 Meeting Held on June 15, 2012 ("341

Meeting Transcript"). The Settlement Payment represented his initial settlement payment after the

deduction of attorneys' fees. Mr. Hughes' Testimony, April 9, 2013 at 10:35-10:36 a.m.; Trial

Exhibit 10, 341 Meeting Transcript. Mrs. Hughes testified that they made plans about how to use

this money when they learned it was coming. She stated that paying "old, old bills" "wasn't what

we were thinking of doing with this money." Mrs. Hughes' Testimony, April 9, 2013 at 9:55 a.m.

She testified that "every bill was past due" and that they were desperate. Mrs. Hughes' Testimony,

April 9, 2013 at 9:46-9:47 a.m.; 9:50-9:55 a.m. The Debtors had no checking account and were

concerned about garnishment of anything they might put into an account. *Id.* at 9:48 a.m. For these

reasons, they took the settlement check to a check cashing company where they paid a fee of over

$1500 to obtain the settlement in cash – stacks of one hundred dollar bills. *Id.* Mrs. Hughes

testified that she was "terrified" having that much cash. *Id.* This sum of money was more money

than the Debtors had made together in any one of the three years preceding their bankruptcy filing.

Trial Exhibit 1 at 8, Statement of Financial Affairs, Question 1.

   Over the next eight days in March, the Debtors spent the entire Settlement Payment.

Exhibit 8 presented at trial shows how $38,975 of the Settlement Payment was spent. Trial Exhibit
8. They paid $10,000 as a down payment on a 2011 used car, made a gift of $3500 to two of their
children to make up for missed Christmases, birthdays and graduations. Mrs. Hughes' Testimony,
April 9, 2013 at 9:50-9:51 a.m. They repaid an aunt $3000 for her help with Mr. Hughes' mother,
and they repaid a brother with cash and the transfer of a truck. They paid off title pawn companies
that held their cars, their wedding rings and all of their electronic household goods. *See* Trial
Exhibit 8; Trial Exhibit 10, 341 Meeting Transcript. They surrendered a 2006 automobile that had
been having mechanical problems. They moved from their mold infested mobile home to a new
apartment and bought new furniture, as well as some luxuries like a large television set and a
gaming system. After several years of financial deprivation – even desperation— the Settlement
Payment was providing them with a fresh start. That fresh start was cut short when the owners of
the mobile home they had surrendered threatened to sue them for the balance due on the mobile
home. In response to that threat, the Debtors sought bankruptcy relief. *See* Mrs. Hughes'
Testimony, April 9, 2013 at 9:52-9:54 a.m.; Trial Exhibit 8; Trial Exhibit 10, 341 Meeting
Transcript.

The Debtors initially approached their attorney about a Chapter 13 proceeding but were
advised that a Chapter 7 might be the appropriate route given that Mrs. Hughes had very little
income and that Mr. Hughes was on disability. Mrs. Hughes' Testimony, April 9, 2013 at 10:02
a.m. They worked with a paralegal and completed their petition, statement of financial affairs and
schedules. The list of creditors was obtained from a credit report and supplemented by the Debtors.
*Id.* at 10:10 a.m. That list was 17 pages long and listed over $65,000 in unsecured debts which
included automobile deficiencies, credit cards, and, as was to be expected given the Debtors'
medical problems, numerous medical bills. *See* Trial Exhibit 1, pp. 24-41. Approximately eight

4

weeks after receiving the Settlement Payment, the Debtors filed Chapter 7 bankruptcy and Richard P. Jahn, Jr. was appointed as their trustee.

The statements which are the basis of the Trustee's complaint are contained in the Statement of Financial Affairs ("SOFA") and the Schedules. The petition is signed under penalty of perjury. Trial Exhibit 1 at 3. The Debtors signed that they had obtained and read the notice required by 11 U.S.C. § 342(b). *Id.* That notice is to be provided to every debtor at their first meeting with a debtor's attorney who falls within the definition of a debt relief agency. The attorney is required to give the debtors a notice that "a person who knowingly and fraudulently conceals assets or makes a false oath or statement under penalty of perjury in connection with a case under this title shall be subject to fine, imprisonment, or both." 11 U.S.C. § 342(b)(2)(A).

The SOFA is also signed by both Debtors under penalty of perjury. Trial Exhibit 1 at 14. The Debtors swore that they read the answers and that they were "true and correct." Contrary to this representation, there are several answers that are neither true nor correct.

SOFA Question 2 asks for a disclosure of all other income the Debtors received from sources other than employment or the operation of a business. The Settlement Payment is not listed there. When Mr. Hughes was asked at trial why he had omitted the Settlement Payment, he stated that he did not think it was income. Mr. Hughes' Testimony, April 9, 2013 at 10:35-10:37 a.m. He did not disclose this payment to his attorney or the paralegal assembling his SOFA or schedules. He did not ask if the largest source of funds he had received in three years might be "income from a source other than employment." *Id.*

SOFA Question 3.a. asks if the Debtors made any payments to creditors in excess of $600 within 90 days prior to filing. The Debtors answered "none." Trial Exhibit 1 at 9. Mrs. Hughes testified that they did not pay a whole lot of attention to what they were doing when they were

5

completing the schedules. Mrs. Hughes' Testimony, April 9, 2013 at 9:56 a.m. Mr. Hughes said

that he did not understand the question to ask for information about creditors who had been paid in

the past. Mr. Hughes' Testimony, April 9, 2013 at 10:40 a.m. At another point, Mrs. Hughes

testified that she did not think that this question meant creditors who had been paid prior to the

bankruptcy filing. She testified that she did not think the ones that she had paid needed to be listed.

Mrs. Hughes' Testimony, April 9, 2013 at 10:10-10:11 a.m. She testified that "we weren't listing

what we got with the $43,000. . . ." *Id.* at 10:11 a.m.

   The court acknowledges that Mrs. Hughes does seem to have been confused about the

differences between the creditors listed in the schedules who are creditors who remain unpaid at

filing and the creditors who are supposed to be listed in response to Question 3.a., the creditors

who have been paid prior to filing. Perhaps she did not appreciate that the two lists serve two

different functions in a bankruptcy case. The schedules provide the list of creditors who will

participate in any distribution in the case. The answer to Question 3.a. in the SOFA provides a list

of potential preferences for the Trustee to recover to ensure an equitable distribution of the

Debtors' assets. Nevertheless, the court finds that the confusion could have been cleared up had

Mrs. Hughes read the question. It clearly refers to creditors who had been paid within the **90 days**

prior to filing. The time period is even printed in bold on the form. She also testified that she did

not read the questions and her answers when she came in the second time to sign them. Mrs.

Hughes' Testimony, April 9, 2013 at 10:14 a.m.

   SOFA Question 3.c. asks if the Debtors made any payments to insiders. They answered

"none." Trial Exhibit 1 at 9. Mr. Hughes testified that he did not know what an insider was. Mr.

Hughes' Testimony, April 9, 2013 at 10:41 a.m. The court notes that the definition of an insider is

given on the first page of the form for the SOFA. Trial Exhibit 1 at 8. Mrs. Hughes did not provide

any testimony regarding this answer specifically, but she did testify that she did not think of their aunt as a "creditor" because she was "family." Mrs. Hughes' Testimony, April 9, 2013 at 10:01 a.m. This response particularly concerns the court because Mrs. Hughes testified how repayment of Mr. Hughes' aunt was important to both Debtors. Mrs. Hughes' Testimony, April 9, 2013 at 10:01 a.m. Mrs. Hughes testified that they had "other things [they] had to do" and "other things [they] had to take care of" with the money besides saving it or putting it in a bank account, which included paying Mr. Hughes' aunt. Mrs. Hughes Testimony, April 9, 2013 at 9:50 a.m. It was not a transaction that was simply forgotten. In fact, both Debtors were aware of what dire financial straits they were in before the Settlement Payment arrived and what financial problems were solved by it. The court does not find their explanation credible that they did not see a correlation between their payments in March to creditors and insiders and their answers to these questions in May.

SOFA Question 4 asks what suits the Debtors are or have been involved in during the year before the filing. The Debtors answered "none." Trial Exhibit 1 at 9. Mr. Hughes explained his answer by stating that he believed that the Class Action Lawsuit was over since he had received his Settlement Payment. Mr. Hughes' Testimony, April 9, 2013 at 10:35-10:36 a.m.; 10:42 a.m. That response only explains why he might have omitted a response listing a lawsuit in which he was currently involved, but that is not the question. Furthermore, the court does not find his explanation credible. He was aware that he was still involved in the Class Action Lawsuit as demonstrated by his explanation of the Class Action Lawsuit at the 341 meeting. *See* Trial Exhibit 10. He acknowledged that he received a "small settlement" and that there was a holdback of another 20%. *Id.* at 3. The court finds that there was no hesitancy in his response to questions about the lawsuit at the first meeting of creditors. As for Mrs. Hughes, she simply testified that when she

7

was asked about lawsuits in the attorney's office, she did not consider the Class Action Lawsuit to be a lawsuit because they never appeared in court but merely received a check in the mail. Mrs. Hughes' Testimony, April 9, 2013 at 9:57 a.m.

SOFA Question 7 asks about any gifts made during the two years before filing. Trial Exhibit 1 at 10. The Debtors answered "none." In fact they had made two gifts totaling $7000 to their children. *See* Trial Exhibit 8. Mrs. Hughes' touching explanation for the gifts to her children leads the court to believe that these gifts were significant events in the lives of the Debtors. They were parents who desired to make up for their prior financial inability to provide for their children. No one at trial asked the Debtors if they were aware that these transfers might be recovered by a trustee if they were disclosed. The Debtors repeatedly stated that they did not intend to do anything fraudulent; but in response to the question why they failed to disclose these transfers, the Debtors offer only that they did not notice the question or that they do not recall "specifically" being asked to provide information about gifts. Mrs. Hughes' Testimony, April 9, 2013 at 9:59-10:00 a.m.; Mr. Hughes' Testimony, April 9, 2013 at 10:42-10:43 a.m. The court does not find this to be a credible explanation.

In contrast to these responses, the Debtors did disclose a transfer made to Mr. Hughes' brother. Trial Exhibit 1 at 14, SOFA Question 10. In March of 2012, they transferred a truck to him. Why they comprehended that this transfer made in March of 2012 needed to be disclosed, but not any other transfers made in March of 2012, was not satisfactorily explained at the trial.

With respect to the schedules, the Debtors did not list the Class Action Lawsuit as an asset on Schedule B. They did not list the $10,000 of household goods that they had purchased approximately 8 weeks before filing. Rather they listed the total value of their household goods as being $1000. Trial Exhibit 1 at 18. Mrs. Hughes testified that she challenged the value put on the

8

new bed by the attorney's paralegal since the bed had just been purchased, but was told to put a "yard sale" price on it by the attorney's paralegal. Mrs. Hughes' Testimony, April 9, 2013 at 9:58-9:59 a.m. When Schedule B was later amended, household goods were itemized and valued at $8,275. Trial Exhibit 2, Amended Schedule B. The Debtors' amended Schedule B relating to personal property included many of the items they purchased with the Settlement Payment, including a $500 security deposit; $1,000 furnishings; $2,000 living room set; $3,000 Serta mattress; $1,100 washer and dryer with service plan; $800 60-inch flat-panel television; $200 PS3 with games; $100 32-inch flat-panel television; and a $75 small refrigerator. *Id.* The Amended Schedule B also included the 2011 Toyota Camry purchased with the Settlement Payment. *Id.* at p. 3. The Debtors listed the value of the new vehicle as $16,342, although the purchase price had been $20,497.48 only 8 weeks earlier. Trial Exhibit 2. Amended Schedule B; Trial Exhibit 9, Proof of Claim No. 1. The Debtors claimed exemptions in much of the property listed as personal property on the Amended Schedule B on their Amended Schedule C. Trial Exhibit 2, Amended Schedules B and C at 5.

No corrections were made to the SOFA or Schedules until after the first meeting of creditors. At the first meeting of creditors on June 15, 2012, the Trustee questioned the Debtors about where they obtained $10,000 to make a down payment on a car. Mr. Hughes responded:

> Um, I had gotten a class action lawsuit settlement from Avandia – Avandia Claim Litigation Group – they believed that is what caused my heart attack and I had gotten a small settlement from that and I paid off the debt and stuff that I had at that time. I had two cars that I owned that were both in pawn; I had our rings in pawn; everything electronics that we had was in pawn; I had pawned everything trying to stay afloat just to keep our heads above water. So when that money came in --- I paid off all of that – I had borrowed $20 – uh excuse me, $3000 from my aunt, at one point, and I had borrowed some money from my brother. So, um… My mother passed away October of last year and I had to pay some of her funeral expenses out of it.

Trial Exhibit 10 at 3.

     The Trustee asked if these payments were on their petition, and Mr. Hughes testified that "I did not put them on the petition because we paid those debts off before we filed bankruptcy so that no…" Trial Exhibit 10 at 3. The Trustee interrupted before the sentence was finished. Mrs. Hughes interjected that these creditors "were not actually creditors from the credit bureau." *Id.* at 4. With respect to the Class Action Lawsuit itself, Mr. Hughes stated that "[t]he total settlement amount is $43,000.00, but there is still part of it that, uh, I haven't gotten and don't know when I will get." *Id.* He further testified that there was 20% of the total Avandia settlement held in case of appeals. *Id.*

## II.    Issues

The court finds that there are significant misrepresentations that were made under oath in the SOFA. The court also finds that once the Trustee asked the right question at the first meeting of creditors, there was no hesitancy or subterfuge on the part of the Debtors in disclosing the information that should have been disclosed originally. The question before the court is whether that willingness to cooperate after being caught is sufficient to rebut the presumption that the Debtors knowingly and fraudulently made false oaths in this case.

## III.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding. The Trustee's action regarding the Debtors' eligibility for a discharge is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(J).

10

IV.    **Analysis**

A.    **Non-Dischar\geability Pursuant to 11 U.S.C. § 727(a)(4)(A)**

The Bankruptcy Code provides that a debtor shall receive a discharge from the court unless

"the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath

or account; . . ." 11 U.S.C. § 727(a)(4)(A). Courts in this Circuit have determined that to state a

claim pursuant to § 727(a)(4)(A), a plaintiff must demonstrate by a preponderance of the evidence

the following five elements:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the
> debtor knew the statement was false; (4) the debtor made the statement with
> fraudulent intent; and (5) that the statement related materially to the bankruptcy
> case.

*Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 903 (Bankr. W.D. Tenn. 2009) (citing *Keeney v.

Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000)). Whether a false statement under oath has

been made pursuant to 11 U.S.C. § 727(a)(4)(A) is a question of fact. *In re Jarrett*, 417 B.R. at 903.

Statements made by a debtor in his bankruptcy schedules, his personal statement of

financial affairs, and at 341 meetings are all statements made under oath. *Noland v. Johnson (In re

Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) (citing *Hamo v. Wilson (In re Hamo)*, 233

B.R. 718, 725 (B.A.P. 6th Cir. 1999)) (other citations omitted). The court has found that the

Debtors signed the SOFA under penalty of perjury. The court has also found that numerous

answers to the questions in the SOFA were false.

Under paragraph 2 of the SOFA, the Debtors failed to report income in 2012 of a partial

distribution of $43,806.00 from the Avandia settlement, as income other than from employment or

operation of business. This omission is a materially false statement. Under paragraph 4(a) of the

SOFA, requiring Debtors to list all suits and administrative proceedings to which he or she is or

was a party within one year preceding filing, the Debtors failed to list the fact that Debtor Darrell

Hughes is involved in a Class Action Lawsuit over injuries from Avandia, Case ID

AVN009443AWK. The Debtors failed to list two transfers of $3,500.00 each to two of their

children within 90 days of the petition on the SOFA as gifts under paragraph 7. The Debtors failed

to list the transfer of $3,000.00 to Doris Skwiot, an aunt, as a loan repayment to an insider within

90 days of the petition under paragraph 3(c) of the SOFA. Among other things, the Debtors failed

to list the following transfers to creditors made in March, 2012, within 90 days of the petition,

under paragraph 3(a) of the SOFA:

     i.   $10,000.00 to Hunt Nissan to purchase a 2011 Toyota Camry.
    ii.   $1,533.25 to US Money Shops for the Avandia settlement check cashing fee.
   iii. $1,090.13 to Quality Title Loan to pay off title pawn.
   iv. $1,443.60 to National Title Pawn of Ringgold to pay off title pawn.

Trial Exhibit 8.

      The third element is whether the Debtors knew these statements were false. With respect to

the third element of knowledge required to demonstrate a false oath or omission, " '[k]nowledge

that a statement is false can be evidenced by a demonstration that the debtor knew the truth, but

nonetheless failed to give the information or gave contradictory information.' " *Jahn v. Flemings

(In re Flemings)*, 433 B.R. 230, 239 (Bankr. E.D. Tenn. 2010)(quoting *Williams v. Courtney (In re

Courtney)*, 351 B.R. 491, 506 (Bankr. E.D. Tenn. 2006)). The court finds that the Debtors knew

that they had been involved in the Class Action Lawsuit, made gifts, paid creditors, and purchased

household goods in the two months before the bankruptcy. When they answered that they had done

none of those things, they knew a statement to that effect would be false. Their only defense is that

they claim that they did not know that they were making such a statement. Mrs. Hughes claims that

no one asked her the questions. Even if she was not asked the questions, she was given the filings

to review. However, the court does not believe the questions were not discussed. Mr. Hughes was

aware of the question regarding the transfer to his brother and was able to respond accurately. The

court thinks it is more likely that the Debtors rationalized that the transactions involving the

Settlement Payment were somehow different than their transactions with other creditors because

the Settlement Payment transaction involved providing for family members. While the court is

empathetic with a parent's desire to provide for his or her family, the Bankruptcy Code does not

except transactions with family members from disclosure. To the contrary, insider transactions are

scrutinized more closely in order to ensure that all creditors are treated equitably. Another concern

the court has with the Debtors' explanation for their omissions is the Debtors' approach to signing

their disclosures. They had so little regard for the significance of their actions that they did not

even bother to read the questions and their answers, despite the fact that they were signing under

the penalty of perjury. Whether it was rationalization or recklessness, the court does not find that

the Debtors' explanations are sufficient for the court to find that they did not know that their

answers were false.

With respect to the last element of fraudulent intent, circumstantial evidence or a debtor's

course of conduct may be used to infer the debtor's intent. *In re Jarrett*, 417 B.R. at 903 (citing *In

re Hamo*, 233 B.R. at 725). However, a finding of fraudulent intent "is a question of fact that is

highly dependent on the bankruptcy court's assessment of the debtor's credibility." *Roberts v.

Debusk (In re Debusk)*, No. 3:08-cv-427, 2009 WL 1256891, at *4 (E.D. Tenn. May 1, 2009). An

inference of deceitful intent may be found where the evidence demonstrates that a series or pattern

of errors occurred. *See General Motors Co. v. Heraud (In re Heraud)*, 410 B.R. 569, 581 (Bankr.

E.D. Mich. 2009). The court finds such a pattern to exist in this case. Other than the transfer to Mr.

Hughes' brother, none of the transactions related to the Settlement Payment were disclosed. The

13

existence of an additional payment being due from the Class Action Lawsuit was also not disclosed. "If the trustee meets his burden of proof on the issue of intent, the burden shifts to the debtor to rebut the presumption." *In re Flemings*, 433 B.R. at 240. Disclosure or correction of an inaccuracy at the first meeting of creditors is evidence that there was no fraudulent intent. *See Buckeye Retirement Company LLC v. Heil (In re Heil)*, 289 B.R. 897, 908 (Bankr. E.D. Tenn. 2003). However, in this case, the court does not find that it is sufficient to rebut the circumstantial evidence of fraudulent intent.

The Trustee cites several badges of fraud, in addition to the sheer number of false statements, as support for his contention that there was fraudulent intent. *See In re Flemings*, 433 B.R. at 236 (listing "badges of fraud" that may be analyzed to determine fraudulent intent through circumstantial evidence and which can include transfers between family members, transfers without consideration, secret conveyances, and an overall pattern of such conveyances during times of financial difficulty). He notes the false oaths related to transactions which occurred while the Debtors were under financial distress at a time close to the bankruptcy filing. He further cites undisclosed transfers that were gifts to family members and that represented transfers for no consideration at a time the Debtors were insolvent. The Debtors were also making cash payments to their creditors.

To counter this evidence, the Debtors must provide a "credible explanation." Such an explanation must be "both plausible, and despite all the indications of fraud, ... still capable of being believed." *United States Trustee v. Halishak (In re Halishak)*, 337 B.R. 620, 629 (Bankr. N.D. Ohio 2005). The Debtors explain their omissions by claiming they did not understand the meaning of the questions or that they did not even look at their answers. Failure to read the answers is not a satisfactory response.

14

> A debtor . . . is expected to thoroughly review the petition's requirements . . . . a
> debtor cannot, merely by playing ostrich and burying his head deeply enough in the
> sand, disclaim all responsibility for his statements. Thus a failure to read the
> disclosure requirements of a bankruptcy petition would at the very least be reckless,
> thereby still justify[ing] a denial of a discharge.

*Id.* at 631-632 (citations omitted). The Debtors' only other evidence that they had no fraudulent

intent is that they disclosed everything after being asked about the Settlement Payment. Despite

their willingness to cooperate after the fact, the court does not have confidence that any of the

transfers would have been disclosed but for the Trustee's question. Even then, Mr. Hughes' initial

answer was to refer to the Settlement Payment of $43,806 as a "small settlement."

The Sixth Circuit explained in *In re Keeney* how courts should analyze section

727(a)(4)(A) claims:

> " 'Complete financial disclosure' " is a prerequisite to the privilege of discharge.
> The Court of Appeals for the Seventh Circuit has explained that intent to defraud
> "involves a material representation that you know to be false, or, what amounts to
> the same thing, an omission that you know will create an erroneous impression."
> A reckless disregard as to whether a representation is true will also satisfy the intent
> requirement. " '[C]ourts may deduce fraudulent intent from all the facts and
> circumstances of a case.' " However, a debtor is entitled to discharge if false
> information is the result of mistake or inadvertence. The subject of a false oath is
> material if it " 'bears a relationship to the bankrupt's business transactions or estate,
> or concerns the discovery of assets, business dealings, or the existence and
> disposition of his property.' "

227 F.3d at 685-86 (citing *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)) (quoting *Williamson v.*

*Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987); *Beaubouef v. Beaubouef (In re*

*Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)). The Debtors have argued that their omissions were

inadvertent. The court would have to find that reckless indifference to reviewing the schedules

would qualify as inadvertence to excuse the false statements in this case.

The Debtors rely on *In re Heil*, in support of their argument that an inadvertent failure to

disclose assets does not warrant denial of a discharge under § 727(a)(4)(A). 289 B.R. 897. In *In re*

*Heil* the court explained that:

> Fraudulent intent "involves a material representation that [a debtor knows] to be
> false, or, what amounts to the same thing, an omission that [he knows] will create
> an erroneous impression." A reckless disregard or indifference for the truth also
> evidences fraudulent intent. Once again, intent may be inferred from a debtor's
> conduct, and a continuing pattern of omissions and false statements in a debtor's
> bankruptcy schedules exhibits reckless indifference. On the other hand, if a debtor
> simply gives false information mistakenly or inadvertently, the intent element is
> not satisfied. Generally, a debtor's amendment of his schedules and/or reporting of
> omissions or misstatements prior to or at the meeting of creditors evidences a lack
> of fraudulent intent. On the other hand, a debtor "is not permitted to decide to omit
> an asset because the debtor believes it lacks value."

289 B.R. at 908 (quoting *Keeney*, 227 F.3d at 685 and citing *In re Hamo*, 233 B.R. at 724-25; *Gold
v. Guttman (In re Guttman)*, 237 B.R. 643, 647 (Bankr. E.D. Mich. 1999)). The court further noted
that " '[a] claim is material if it hinders the administration of the [bankruptcy] estate.' " *In re Heil*,
289 B.R. at 908 (quoting *Calisoff v. Calisoff (In re Calisoff)*, 92 B.R. 346, 355 (Bankr. N.D. Ill.
1988)). In *In re Heil* the court denied the debtor a discharge based on his failure to disclose a
transaction relating to a $14,000 debt on four separate occasions. *Id.* at 909. The court in *In re Heil*
relied on the repeated failure to disclose as a basis for finding intent.

Repeated failure to disclose after the first meeting is not present here; however, the court
relies on other facts to find intent. The number of inaccuracies in the SOFA, the relationship of the
inaccuracies to a very significant event in the Debtors' financial circumstances, the proximity of
the undisclosed transfers to the bankruptcy filing, the benefit to the insiders if the transfers were
never discovered, and the benefit to the Debtors if the existence of the Class Action Lawsuit had
gone undisclosed and the remaining recovery was paid to Mr. Hughes free from the claims of his
creditors – all support a finding of intent which has not been rebutted.

### V.    Conclusion

The Trustee has proven the elements for a denial of the Debtors' discharge pursuant to §

16

727(a)(4)(A). The Debtors' discharge will be denied.

The ruling in the case should not be read as a holding by this court that a debtor can never correct a mistake in his petition, SOFA or Schedules. A debtor should never consider that a second false oath is the best way to remedy a false statement, and coming forward with the correct information as soon as possible is the best course of conduct following discovery of a mistake. However, coming forward does not guarantee that a right to a discharge may be regained. For that reason, the best practice is to avoid mistakes in the beginning and that requires reading the questions and thoughtfully preparing the answers. In this case, the Debtors are being denied their discharge because their only explanation for their false statements is that they did not focus on the questions and their answers, despite being informed that false statements might result in fines and imprisonment. The court cannot tell from the testimony at trial, how thoroughly the questions were explained to the Debtors by their attorney or whether the reason for the questions was explained to ensure that correct answers were given. The court expects debtors' attorneys to be diligent in their efforts to ensure that debtors understand the significance of their representations in the filing documents. The court also expects the debtors to take responsibility for reading and understanding what they are representing to the court regarding their past financial transactions and their current assets and liabilities.

A separate order will enter.

# # #